**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ABA RETIREMENT FUNDS f/k/a** | ) | |
| **AMERICAN BAR RETIREMENT** | ) | |
| **ASSOCIATION** | ) | |
| | ) | **No. 09 C 6993** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Judge John J. Tharp, Jr.** |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

This case presents the question of whether Plaintiff ABA Retirement Funds (formerly known as the American Bar Retirement Association, or "ABRA") qualifies as a tax-exempt "business league" under 26 U.S.C. § 501(c)(6). ABRA maintains that the answer is "yes," and sought a refund of the federal taxes it paid on income earned in tax years 2000 to 2002 in connection with its sponsorship of retirement plans for the legal industry. The IRS says "no," however, and it denied ABRA's refund claim. The parties now stipulate to the relevant facts and bring cross-motions for summary judgment. For the reasons stated below, the Court concludes that ABRA did not qualify as a business league under 26 U.S.C. § 501(c)(6) during the period at issue, and therefore grants the Government's motion for summary judgment and denies ABRA's motion.[1]

---

[1] This opinion addresses whether ABRA qualified as a tax-exempt organization only for the years in question (2000-2002). It does not address whether ABRA met the exemption criteria in any subsequent years.

The American Bar Association ("ABA") is a tax-exempt organization that seeks to serve its members, the legal profession, and the public by, in its words, "defending liberty and justice as the national representative of the legal profession." ABRA Statement of Facts (Dkt. 53) ¶ 3. The ABA incorporated ABRA as an Illinois not-for-profit corporation in 1963 for the purpose of promoting and facilitating the operation and use of tax-qualified retirement plans for members of the ABA. ABRA's prospectus stated that it was organized "for the sole purpose of providing members of the [ABA] and their employees with a retirement plan designed to take advantage of the income tax benefits which apply to a qualified retirement plan." Joint Stipulation of Facts (Dkt. 35) ¶ 1.[3] ABRA's only members are those individuals who constitute the ABA's Board of Governors. *Id.* ¶ 6. ABRA's members elect a board of directors, which in turn appoints officers and names a trustee of the retirement plans. *Id.*

ABRA created and maintains several IRS-approved master tax-qualified retirement plans for adoption by lawyers and law firms.[4] These plans are known as the American Bar Association

---

[2] On cross-motions, granting summary judgment is appropriate when the evidence as a whole shows that there is no genuine dispute as to any material fact. *Davis v. Time Warner Cable of Se. Wisconsin, L.P.*, 651 F.3d 664, 671 (7th Cir. 2011). Because the Court finds that summary judgment in favor of the Government is warranted even if the undisputed facts and reasonable inferences are viewed in the light most favorable to ABRA, the facts in this opinion are stated in that light.

[3] ABRA argues that the Court should deny the Government's motion for summary judgment for failing to attach a statement of undisputed facts in violation of Local Rule 56.1(a)(3). But because the parties submitted a joint stipulation of facts and the Government relies solely on those facts, it was not required to file an additional statement of undisputed facts that would amount to nothing more than a rehash of the stipulated facts.

[4] Generally speaking, a tax-qualified retirement plan allows the employer a tax deduction for contributions it makes to the plan and permits employees to defer payment of taxes on income invested in the plan, and on investment earnings in the plan, until plan assets are distributed. A qualified plan may be either a defined benefit plan, where benefits are ultimately paid in

Members Retirement Plan and the American Bar Association Members Defined Benefit Pension Plan (the "Plans"). ABRA has the authority under the Plans to engage, monitor, and replace vendors, and is responsible for the design and maintenance of Plan documents. *Id.* ¶ 8. Beginning in 1992 and continuing through the years at issue, ABRA contracted with State Street Bank and Trust Company ("State Street") as its primary vendor of the various retirement investments available through the Plans, and ABRA oversaw State Street's activities. ABRA made its Plans available to lawyers and law firms, as well as the general public, without charge upon request. *Id.* ¶ 9. The Plans included both popular 401(k) plans and rarely-used defined benefit plans. The combination of the Plans and ABRA's and its vendors' activities in connection with the Plans is known as the "Program."

During the years at issue, State Street was the sole trustee for the Program's assets. *Id.* ¶ 14. State Street had the right to engage and terminate investment advisors, but it was obligated to consult with ABRA and give full consideration to ABRA's recommendations. State Street was also responsible for record keeping and certain administrative services required by the Program. ABRA, however, was responsible for oversight and monitoring of Program vendors including State Street, and ABRA drafted and obtained tax qualification of the Plans, negotiated contracts with vendors, and performed certain fiduciary duties as required by ERISA. *Id.* ¶¶ 22-23.

State Street was responsible for directly marketing the Plans to the legal profession, but ABRA reviewed and approved the annual marketing plan developed by State Street and made recommendations regarding the goals set forth in the marketing plan, such as targets for the number of new participants and growth in the amount of assets invested. *See, e.g.,* Dkt. 40-8 at

---

accordance with a predetermined formula, or a defined contribution plan, where the benefits available for distribution are a function of the individual's investment returns.

61, Dkt. 41 at 37. ABRA also promoted the use of the Plans by educating and encouraging employers and attorneys about the benefits of providing for retirement through the Program. *Id.* ¶ 16. ABRA encouraged participation in the Program as the "most sound way possible" to save for retirement. *Id.* ABRA also sent letters soliciting attorneys to participate in the Program, and distributed information that directly promoted participation in the Program. *Id.* ¶ 17. ABRA's board of directors discussed ways to expand participation in the Program, and ABRA's 2001 and 2002 marketing plans each described the long-term objectives of the Program marketing team as increasing awareness of the Program, increasing the market share of the Program, and increasing plans, participants, and assets in the Program. *Id.* ¶ 18-19. The Program's website, which State Street made available to participants, included information about investment options and stated that the Program's goal was "to provide investment options that will help our participants meet their individual retirement needs." *Id.* ¶ 28. Participants were also given access to a computer program that would give them personalized investment advice about the eleven Plan options available in the Program. *Id.* ¶ 29.

For its services in connection with the Program, the Plans paid ABRA a fee based on a percentage of the total assets invested in the Program, other than assets invested in self-directed brokerage accounts.[5] *Id.* ¶ 24. ABRA set its fees based on its estimated cost of operations, including the salaries of its three employees and fees paid to outside consultants. *Id.* During the period at issue, other retirement plan business organizations also solicited and competed for the retirement investments of attorneys, and the Program was one of numerous options open to

---

[5] Participants who elected to use self-directed brokerage accounts were nevertheless required to invest a minimum of 5% of their total investment in accounts subject to the fee. Approximately 10-12% of Program assets were invested in self-directed brokerage accounts; the remaining assets were invested in accounts that were directly subject to ABRA's fee. ABRA Statement of Facts (Dkt. 53) ¶ 36.

lawyers and law firms seeking to participate in retirement plans. *Id.* ¶ 26. Competitors of the program included mutual funds and other organizations that were in business to make a profit by providing retirement investment options and other retirement services. *Id.* ¶ 27. Some of the Program's competitors offered broader investment offerings than the Program, and those offerings were formidable alternatives to the Program's options. *Id.* ¶ 30. The Program was unique, however, in the sense that it was the only retirement program authorized by the ABA and designed specifically for the legal market. ABRA Statement of Facts (Dkt. 53) ¶ 12.

Between 2000 and 2002, ABRA's gross income from fees and interest was between $1.6 and $1.9 million annually, and its taxable income was between $384,000 and $672,000 per year. Joint Stipulation of Facts (Dkt. 35) ¶ 32. By the end of 2002, ABRA had accumulated assets of approximately $3.5 million. *Id.* ABRA paid a total of nearly $500,000 in federal income taxes during the 2000-2002 period. *Id.* In June 2004, ABRA filed (for the first time[6]) an Application for Recognition of Exemption Under Section 501(a), seeking exemption from the payment of federal taxes on income it earned from the Programs. *Id.* ¶ 33. The IRS denied the application in August 2005 and thereafter ABRA filed timely claims for refund of the taxes it paid for 2000, 2001, and 2002. *Id.* ¶ 33-34. Those claims were disallowed by the IRS in November 2007 and ABRA then instituted this law suit. *Id.*

## DISCUSSION

Section 501(c)(6) of the tax code provides that certain organizations are exempt from paying federal income taxes. Those organizations include:

> Business leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues (whether or not administering a pension fund for

---

[6] "Prior to seeking tax-exempt status when it filed its Form 1024 on June 28, 2004, ABRA had always treated itself as a taxable entity." Joint Stipulation of Facts (Dkt. 35) ¶ 5.

football players), not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual.

26 U.S.C. § 501(c)(6).

ABRA claims to be a "business league" under the statute. Treasury Regulation 1.501(c)(6)-1 (26 C.F.R. § 1.501(c)(6)-1) further defines a business league as follows:

A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining, is not a business league. An association engaged in furnishing information to prospective investors, to enable them to make sound investments, is not a business league, since its activities do not further any common business interest, even though all of its income is devoted to the purpose stated. . . .

26 C.F.R. § 1.501(c)(6)-1.

Parsing this text, the regulation requires that an organization meet the following criteria to constitute a "business league":

It is an organization:

(1) of persons having a common business interest;

(2) whose purpose is to promote the common business interest;

(3) not organized for profit;

(4) that does not engage in a regular business of a kind ordinarily conducted for profit;

(5) whose activities are directed to the improvement of business conditions at one or more lines of a business as distinguished from the performance of particular services for individual persons; and

(6) of the same general class as a chamber of commerce or a board of trade.

*Bluetooth SIG Inc. v. United States*, 611 F.3d 617, 622 (9th Cir. 2010). The regulation also states that if an organization is "engaged in furnishing information to prospective investors to enable them to make sound investments," its purpose is not "to promote [a] common business purpose" and therefore it does not constitute a business league.[7]

Exemptions from taxation "are not to be implied; they must be unambiguously proved." *United States v. Wells Fargo Bank*, 485 U.S. 351, 354 (1988). A party seeking an exemption "must demonstrate compliance with the specific requirements set forth in the statute granting the exemption," and "[t]he party claiming the exemption bears the burden of proof of entitlement." *Kile v. Commissioner*, 739 F.2d 265, 268 (7th Cir. 1984). Therefore, to qualify for a business league classification, ABRA must meet each and every requirement of § 1.105(c)(6). *Eng'rs Club of San Francisco v. United States*, 791 F.2d 686, 691 (9th Cir. 1986). ABRA claims that it easily satisfies most of these criteria, acknowledging only that the fourth and fifth factors are subject to debate. The Government takes the view that ABRA fails to meet most, if not all, of the factors. The Court agrees with the Government, finding that ABRA has failed to establish factors two, four, five, and six. Because ABRA does not meet all of the § 1.105(c)(6) criteria, it does not qualify for an exemption from federal income taxation as a business league.

---

[7] The parties spill a lot of ink arguing about whether this text constitutes a seventh discrete factor that ABRA must establish in order to qualify for tax-exempt status; resolution of that debate is immaterial. Whether it is a discrete factor, as the Government contends, or merely an illustration (which, as ABRA notes, is the view most, if not all, courts to have addressed the question have taken), does not change the fact that, if ABRA is an organization that is "engaged in furnishing information to prospective investors to enable them to make sound investments," then it cannot be considered a business league under the regulation and does not qualify for an exemption under § 501(c)(6).

## I. ABRA Is Not a Business League.

### A. ABRA Performs Services for Individuals Rather Than For The Industry As A Whole.

ABRA fails to satisfy most of the criteria required to qualify as a business league, but its most glaring deficiency is that its activities were directed principally to individual lawyers and law firms rather than to promoting the well being of the legal industry generally. In this regard, ABRA falls short with respect to both factors two (promotion of a "common business interest") and five (activities directed to improvement of a line of business rather than the provision of services for individuals).

#### 1. ABRA sold services to individuals.

The gist of ABRA's entire argument is that retirement planning promotes better lawyering. ABRA maintains that providing retirement services to legal professionals "advances the common business interests of the legal profession by assisting lawyers in more efficiently managing their practices so that they can concentrate more on serving the interests of their clients," instead of managing retirement plans.[8] ABRA MSJ (Dkt. 52) at 22. At first blush, that may sound like a reasonable proposition, but it does not stand up under scrutiny. The foremost problem is that ABRA's position lacks any limiting principle. By definition, when an attorney purchases *any* product or service for her practice, she does so because she believes that it will improve the quality of her practice; by ABRA's logic, then, offering virtually any product or service could therefore be deemed to advance the common business interests of the legal profession. Selling ergonomic desk chairs to law firms, for example, would be said to promote the common business interests of the legal profession since lawyers who practice without the

---

[8] Relatedly, ABRA also argues that its retirement plans enable attorneys to retire at the appropriate time, rather than having to work past the point when they become unable to manage the daily demands of practice. ABRA MSJ (Dkt. 52) at 22.

distraction of stiff backs are, one presumes, better able to concentrate on serving their clients. The requirement to promote the welfare of the general industry surely demands more than offering goods or services that may enhance the individual practices of the attorneys who purchase them.

It does. When deciding whether an association provides particular services, the "ultimate inquiry is whether the association's activities advance the members' interests generally, by virtue of their membership in the industry, or whether they assist members in the pursuit of their individual businesses." *MIB, Inc. v. Commissioner*, 734 F.2d 71, 78 (1st Cir. 1984). Here, ABRA's activities assisted members in the pursuit of their individual businesses. Though all ABA member attorneys were eligible for the Program, the Program provided retirement benefits only to those attorneys who elected to participate and who contributed to the Plans (which in turn paid fees to ABRA). Lawyers who did not adopt the Program obtained no benefit from its existence; perhaps more importantly, neither did their clients. The Plans benefitted the legal industry as a whole only to the extent that individual firms and attorneys chose to use them; they provided little or no common benefit to the industry in and of themselves. *See MIB,* 734 F.2d at 77 n. 4 (insurance data bank at issue provided no industry benefit in the absence of private use of the database by member firms). Accepting ABRA's proposition that better retirement plans make better lawyers, moreover, implies that those who opted not to partake of ABRA's services were, if anything, *harmed* by ABRA's activities since competitors who opted to pay for ABRA's product enjoyed a competitive advantage. And even if lawyers who did not adopt the Program did enjoy some slight incidental benefit from the Program's existence and use by others, that indirect benefit would be insufficient to establish this factor. *See Steamship Trade Ass'n, Inc. v. Commissioner*, 757 F.2d 1494, 1498 (4th Cir. 1985) (recordkeeping service that may have

slightly benefitted non-users generated taxable unrelated business income because any "incidental synergy is not sufficient to overcome the bare fact that the primary beneficiaries of [the] activity are those members who take advantage of the service").

ABRA's Program was thus unlike those activities that tend to "advance the members' interests generally, by virtue of their membership in the industry," such as "educational programs, lobbying activities, and institutional advertising services." *MIB*, 734 F.2d at 78 (internal quotations and brackets omitted). The Ninth Circuit's decision in *Bluetooth SIG*, 611 F.3d at 628-29, is on particularly on point. There, the court rejected tax-exempt status for an organization formed to promote the Bluetooth networking protocol and trademark because (among other reasons) its activities benefitted only those who purchased the right to use the Bluetooth technology. The court rejected as "implausible" the organization's argument that by promoting the use of Bluetooth enabled devices, sales of all wireless computer devices (including sales by manufacturers who did not use Bluetooth technology) would be enhanced by virtue of the heightened consumer expectations created by Bluetooth's capabilities, *id.* at 624, finding instead that the organization's activities advanced the business interests of its members (manufacturers that used Bluetooth technology) "at the expense of other industry members." *Id. See also Guide Int'l Corp. v. United States*, 948 F.2d 360, 362 (7th Cir. 1991) (trade association comprising organizations that owned IBM mainframe computers not a business league because its activities benefitted only IBM and its customers, not the data processing industry as a whole).

ABRA counters by pointing to *Credit Union Ins. Corp. v. United States*, 86 F.3d 1326, 1334-35 (4th Cir. 1996), where the court found that providing deposit insurance to member credit unions was not a particular service provided to individual employees. The *Credit Union*

court found that deposit insurance sold to individual credit unions "improves the strength of the credit union industry as a whole." *Id.* at 1134.

But as the court explained, its finding was unique to deposit insurance. Though deposit insurance is purchased by financial institutions, the credit unions themselves derived no direct benefit from the insurance. *Id.* at 1335. Deposit insurance confers a benefit only after an insured financial institution becomes insolvent. *Id.* A credit union does not purchase deposit insurance in order to remain a solvent business, but to guarantee that *its depositors* will be repaid if the credit union fails. *Id.* In other words, the depositors, not the credit union, are the direct beneficiaries of deposit insurance. Thus, deposit insurance does nothing to protect individual credit unions from failing (or to benefit them once they have failed), but rather "confers a general benefit to the credit union industry as a whole," giving depositors reason for confidence in credit unions generally. *Id.*

ABRA's Program is not like the deposit insurance at issue in *Credit Union*. If the Program was successful for those attorneys who participated, only those attorneys themselves reaped the direct benefit—financially secure retirement. Benefits to clients or to the legal profession as a whole—if any—were purely incidental. In contrast, in *Credit Union* the deposit insurance at issue directly benefitted depositors if a credit union became insolvent, but the credit union would not benefit. Therefore, providing deposit insurance was not a service performed for the good of the individual credit union that purchased it; rather, it benefitted the credit union industry as a whole because customers could deposit their money with confidence. ABRA's analogy between deposit insurance and retirement planning is therefore inapt.

ABRA's Program has much more in common with other types of insurance programs that benefit the insured directly. In *Illinois Ass'n of Prof'l Ins. Agents, Inc. v. Commissioner*, 801

F.2d 987 (7th Cir. 1986) ("*IAPIA*"), for example, the Seventh Circuit found the fees that a business association received from its promotional and administrative services in conjunction with the sale of errors and omissions insurance to be taxable.[9] In *IAPIA*, an association of insurance agents offered errors and omissions insurance plans to its members, and received in return a percentage of the premiums as a service fee from the insurance companies that underwrote the policies. *Id.* at 989. The association performed tasks very similar to the tasks ABRA performed here: it listed the program in literature that was sent to members, maintained application forms, responded to inquiries regarding the insurance, and informed its members of the need to carry errors and omissions insurance. *Id.* at 990. The Seventh Circuit determined that "providing such insurance coverage benefitted the individuals [who purchased insurance], rather than contributing importantly to improving conditions in a particular line of business." *Id.* at 994. The court therefore affirmed the tax court's ruling that the income derived from IAPIA's promotion of professional malpractice insurance was taxable. *See also, e.g., Professional Ins. Agents of Michigan v. Commissioner*, 726 F.2d 1097, 1104 (6th Cir. 1984) (income earned by tax-exempt entity by providing insurance to individual members was taxable UBI); *Contracting Plumbers Co-op Restoration Corp. v. United States*, 488 F.2d 684, 685-86 (2d Cir. 1974) (organization that repaired damage caused by individual members was not tax exempt);

---

[9] *IAPIA* involved the question of whether certain income of a tax-exempt entity should be taxable as "unrelated business income" ("UBI") under 26 U.S.C. § 511(a). The UBI inquiry is not identical to the § 501(c)(6) inquiry, but one of the factors governing the identification of unrelated business income is whether the income at issue was derived from activity that was substantially related to the organization's exempt purpose. That determination requires an assessment of whether the income was derived from an activity "directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons," as also required by § 1.501(c)(6)-1. *See IAPIA,* 801 F.2d at 993. Neither party has argued that cases involving § 511(a) determinations are categorically irrelevant to issues pertaining to the determination of tax-exempt status under § 501(c)(6) and both have relied on such cases to buttress their arguments.

*Carolinas Farm & Power Equip. Dealers Ass'n, Inc. v. United States*, 699 F.2d 167, 171 (4th Cir. 1983) (income earned by tax-exempt entity by providing insurance to individual members was taxable UBI). Similarly, because the Program benefitted only those individuals who participated in it, ABRA should be characterized as having performed particular services for individual attorneys. Therefore, it was not a business league.

### 2. ABRA provided information to prospective investors.

Treasury Regulation § 1.501(c)(6)-1 directly addresses the distinction between the provision of services to promote a common benefit, and those that benefit members of a group individually, in the context of an organization that provides investment information. Section 1.501(c)(6)-1 states that "[a]n association engaged in furnishing information to prospective investors, to enable them to make sound investments, is not a business league, since its activities do not further any common business interest." ABRA argues that it did not, and cannot, provide advice as to any particular investment. ABRA maintains that it "cannot legally engage in the provision of investment advice" because it is neither a mutual fund nor exempt from the Investment Company Act of 1940, ABRA Reply (Dkt. 59) at 9.

That ABRA cannot provide advice as to any particular investment is really beside the point. The regulatory text does not set the bar so high. By its terms, providing "information to enable prospective investors to make sound investments" covers a substantially broader range of activity than providing specific advice about particular investments, and there can be little doubt that ABRA's activities are subsumed within the scope of the broader regulatory text. The parties stipulated that ABRA promoted the Plans by, among other means, providing information to "prospective participants to save for their retirement *in the most sound way possible* . . . . By participating in the Program, participants were able *to make sound retirement investments.*" Joint

Stipulation of Facts (Dkt. 35) ¶ 16 (emphasis added). ABRA's own publications[10] also reveal that it furnished investment information to potential investors. For example, ABRA published an "Investment Options" brochure that provided information about several funds available for purchase in the program, explaining each fund's investment objective, providing a fund description, and making specific recommendations in the form of "this fund may be for you if . . ." Dkt. 37-3 p. 42 through Dkt. 37-4 p. 10. And ABRA also advertised "personalized investment advice" to potential investors that was available through its website. *See, e.g.,* Dkt. 37-3 pp. 1-2, 35-37. John Puetz, effectively ABRA's CEO, also testified that ABRA's "activities were geared towards furnishing information to investors so that they could make some sound retirement investments . . . ." Puetz Dep. (Dkt. 36-1) at 252.

ABRA clearly "furnished information to prospective investors to enable them to make sound investments." Therefore, regardless of whether this factor of the § 1.501(c)(6)-1 test is a stand-alone factor that ABRA has failed to establish, or whether ABRA's failure to establish this factor merely illustrates its failure to establish that it is an entity that does not further a common business interest (*see* n. 7, *supra*), ABRA's provision of information to potential investors to permit them to "make sound investments"—which ABRA's materials narrowly described as investments in ABRA-sponsored retirement plans—confirms that ABRA cannot be considered a tax-exempt business league.

---

[10] ABRA attached a full listing of its publications (35 in total) to its Form 1024 claim for refund that it filed with the IRS. *See* Dkt. 37 p. 11 ("See attached Exhibit E for a listing of ABRA's publications and copies of such publications."); Dkt. 37-1 p. 64 through Dkt. 37-8 (ABRA's publications).

       3. ABRA's fees for its services were paid by individuals in proportion to the benefits they derived from those services.

ABRA also contends that it should not be deemed to have offered individualized services because the fees it earned were not directly proportional to the benefits that lawyers and law firms that use its Plans or the Program may have received. It points out that in several § 1.501(c)(6)-1 cases courts have determined that an organization provided individual rather than industry-wide services because members paid fees that were directly proportional to the benefits they received. *See, e.g., Evanston-North Shore Bd. of Realtors v. United States*, 320 F.2d 375, 376 (Ct. Cl. 1963) (real estate listing service provided in exchange for fees); *Contracting Plumbers*, 488 F.2d at 685-86 (sidewalk repair service provided to individuals who paid fees for repair); *MIB*, 734 F.2d at 79 (medical information service provided to insurance companies who paid fees for using service). ABRA argues that its fees, which were based only on the amount of assets invested in Funds managed by State Street, ABRA MSJ (Dkt. 52) at 21-23, were not proportional and therefore are not the product of an individualized service. Some attorneys in the Program, it points out, chose to self-direct most of their retirement savings into other funds, leaving ABRA with a reduced fee. And other lawyers may have obtained a benefit without paying any fee whatsoever. For example, a lawyer might have obtained free information about ABRA's plan, but then have chosen to design his own plan outside of the Program without making payment to ABRA.

As an initial matter, ABRA's premise that asset-based fees bore no proportionality to the services it provided is questionable. ABRA has stipulated that the fees it charged were based on its estimate of the costs of its services, Joint Stipulation of Facts (Dkt. 35) ¶ 24, from which one may infer that there was a correlation between services provided and fees charged. Further, the amount of assets invested is a common basis for the assessment of investment management fees.

*See, e.g., Green v. Nuveen Advisory Corp.*, 295 F.3d 738, 742 (7th Cir. 2002) ("the most common investment company adviser compensation scheme [is] based on a percentage of assets"). As the Government observes, "lawyers and other employees who participate in ABRA's Program receive the very immediate and tangible benefit of wealth accumulation on a tax-deferred basis," Gov't MSJ Br. (Dkt. 55) at 11, and they receive it in direct proportion to the amount of assets they have invested through the Program. There is, moreover, a more fundamental correlation between ABRA's fees and the benefits derived by those who used its plans: 100 percent of its fees are derived from those who used, and benefitted from, the Plans; lawyers and law firms who did not partake of ABRA's services paid none of its fees. *See MIB,* 734 F.2d at 79 (citing fact that 91 percent of organization's revenue was derived from provision of database services at issue).

In any event, no court has held that the direct proportionality of an organization's fees to the services it renders is dispositive of whether it is providing individual, rather than general, services. While proportionality is a factor to be considered, *MIB,* 734 F.2d at 79, even where "fees are not as proportional to the benefit received as were the fees in *MIB, Inc.*, there still exists an obvious *quid pro quo*" that shows that the organization was providing particular services to individual persons. *Bluetooth SIG Inc.*, 611 F.3d at 627. Though ABRA's fees may not be exactly proportional to benefits obtained by any particular lawyer or law firm, there is nonetheless a *quid pro quo*: the member paid a percentage of assets invested into a particular Plan and in exchange received the ability to participate in the Program.

4.   ABRA sought market share, not market welfare.

And finally on this point, it also bears noting that ABRA set itself up as a competitor to retirement plans offered by other firms. The ABRA marketing plan for 2000, for example, stated

that ABRA's long-term goal was to increase the market share of the Program—in other words, to win customers away from its competitors in the retirement planning industry. Dkt 40-8 at 59-61; Dkt. 41 at 35-37. In view of that objective, it is difficult to credit ABRA's assertion that its activities were designed to free lawyers throughout the profession from worries about retirement planning. Were that the case, one might expect that it would pursue a strategy of promoting retirement planning generally, and offering its Plans as one means of effective retirement planning among many, rather than by vanquishing its competitors. *See Bluetooth SIG,* 611 F.3d at 625 (noting that organization's advertising campaign was not general campaign to promote interests of industry as a whole as a factor demonstrating that organization was serving the interests of Bluetooth manufacturers only). Presumably, members of the legal profession (like most consumers) would be better served by more choices in the market rather than fewer. But the record reflects that ABRA's objective was not to promote retirement planning generally, but to capture as much of that business as it could within the market comprising legal professionals. That does not seem to be a strategy calculated to enhance the common good of the legal profession.

For all of these reasons, ABRA has failed to establish that its activities promoted a common interest of the legal profession rather than the individual interests of those who participated in the Program, and therefore ABRA does not satisfy the criteria necessary to obtain tax-exempt status under § 501(c)(6).

## B.    ABRA Is Engaged in a Business Normally Carried on For Profit.

ABRA also fails to establish the fourth § 1.501(c)(6)-1 element because it was engaged in a regular business of a kind ordinarily conducted for profit.[11] The tax returns ABRA filed for the years in question state that its business was an employee benefit fund and its product was retirement plans. And as a provider of retirement plans for professionals, ABRA's activities were hardly unique.[12] Indeed, ABRA stipulated that other retirement plan business organizations competed with the Program for retirement funds during the period at issue, and that those competitors included mutual funds and other organizations that were in business to make a profit. Joint Stipulation of Facts (Dkt. 35) ¶¶ 26-27. Mr. Puetz, ABRA's CEO, testified at his deposition that he did not believe that there were any differences in ABRA's Plans and those offered by its competitors, Puetz Dep. (Dkt. 36-1) at 235, and that the competitors offered the same or similar investment opportunities except that ABRA's competitors offered "a lot more" investment opportunities. *Id.* In view of these concessions, it is difficult to come to any conclusion other than that ABRA engaged in a business normally carried on for profit.

---

[11] The parties also dispute whether ABRA can establish the third element, that it was not organized for profit. ABRA notes that it is a not-for-profit corporation, but that is not dispositive in determining whether it was truly organized for profit. *See Florists' Tel. Delivery Ass'n v. Commissioner*, 47 B.T.A. 1044 (Bd. Tax Appeals 1942) (finding that petitioner was organized for profit even though it was incorporated as a not-for-profit corporation). As the Government notes, ABRA earned profits of between $385,000 and $672,000 per year for the years in question, representing an annual profit margin of approximately 28.4% of gross income. Gov't Mot. (Dkt. 55) at 17; Joint Stipulation of Facts (Dkt. 35) ¶ 32. By 2002, it had also accumulated assets of about $3.5 million**.** And where, as here, an activity "is conducted in a competitive profit-seeking manner and regularly earns significant profits, a heavy burden must be placed on the organization to prove profit is not its motive." *Carolinas Farm*, 699 F.2d at 171. But because ABRA plainly was engaged in a regular business of the type ordinarily conducted for profit, however, it makes little difference whether it was also "organized for profit."

[12] ABRA maintains that it provided the only retirement program "designed specifically for the legal profession," but never offers any explanation of how its Plans uniquely addressed retirement planning needs of attorneys and law firm employees.

ABRA seeks to avoid the implication that it is engaged in what normally constitutes for-profit business activity by focusing on State Street's activity rather than its own. And it is true that ABRA did not compete with for-profit retirement planners solely on its own; it relied on State Street to provide investment options and to handle many other aspects of the Program. But the fact that ABRA hired a third party to perform services needed to offer its Plans neither changes the character of ABRA's activity nor diminishes its ultimate authority over, and responsibility for, the Plans. ABRA "was incorporated . . . for the purpose of promoting and facilitating the operation of" the Plans, Joint Stipulation of Facts (Dkt. 35) ¶ 1, and was charged with doing "all things necessary and proper" to implement and carry out, or cause to be implemented and carried out, the Plans. *Id.* ¶ 2. ABRA designed and maintained the Plans to ensure their continued tax qualification. *Id.* ¶¶ 8, 23. As the sponsor of the Program, ABRA was the entity with the authority under the Plan documents to engage, monitor, and replace Program vendors like State Street. *Id.* ¶¶ 8, 14-15. It made recommendations to State Street concerning the hiring and retention of investment advisors, *id.* ¶ 14, participated in the development of marketing plans for the Program, *id.* ¶ 19, and directly promoted the Plan by presenting its message to various ABA Sections and other bar groups and by sending solicitation letters to those groups. *Id.* ¶ 16. In addition, ABRA arranged for the distribution to prospective employers and prospective participants, including through various sections of the ABA, such as its Section of Taxation, of information that directly promoted participation in the Program. *Id.* ¶ 17. This information included some of the 35 different publications. *Id.* In short, ABRA owned and retained ultimate authority over the Plans and the Program.[13] It, not State Street, was the

---

[13] Ironically, ABRA elsewhere argues that its argument for tax-exemption is entitled to a "boost" based on its affiliation with the ABA, which is a tax-exempt organization, noting among other

sponsor—the moving force—behind the Plans and the Program; as such, it was engaged in the business of offering retirement plans whether it hired a vendor like State Street to assist it or not.

As the Government observes in its response brief, "courts have repeatedly found organizations to be engaged in a trade or business even when these organizations provided relatively few services themselves and made available benefit or insurance programs largely through the activities of third-party companies." Gov't Resp. Br. (Dkt. 60) at 7. *See, e.g., State Police Ass'n of Massachusetts v. Commissioner*, 125 F.3d 1, 5-7 (1st Cir. 1997) (finding that tax-exempt organization "engaged in a trade or business" where organization contracted with for-profit companies to provide advertising service); *Steamship Trade Association of Baltimore, Inc. v. Commissioner*, 81 T.C. 303, 307 (1983), *aff'd* 757 F.2d 1494 (4th Cir. 1985) (payroll processing activity constituted a trade or business even when the organization transferred "the relevant information to the [for-profit company] without performing any substantial services so that if the members chose, they could have transmitted the information directly to the" for-profit company); *Louisiana Credit Union League v. United States*, 693 F.2d 525, 534 (5th Cir. 1982) (rejecting "contention that only 'active' participation in an enterprise warrants its treatment as a trade or business"). Thus, the fact that ABRA contracted with a third party vendor (State Street) to perform certain administrative services in the Program does not change the conclusion that ABRA was itself engaged in a trade or business.[14]

_____

things that the ABA "controls ABRA through its ability to select ABRA's Board of Directors." ABRA Resp. Br. (Dkt. 59) at 8.

[14] ABRA advances the same point in support of its argument that it does not provide services to individuals, asserting that its three employee staff was "insufficient to provide individualized service to the many participants in the over 2,000 law firm, lawyer, and other retirement plans sponsored under in the Program." ABRA Reply (Dkt. 59) at 11-12. But ABRA's exempt status is not lost only if it provided in-depth, personalized service to every individual; rather, it is lost if ABRA's activities consisted of any services directed towards the benefit of individual lawyers or

ABRA argues that it is similar to the organization considered in *American Academy of Family Physicians v. United States*, 91 F.3d 1155 (8th Cir. 1996). There, the Academy owned and sponsored group insurance plans that it made available to its members. The insurer that underwrote the plans was required to use a portion of the insurance premiums as reserves to pay future claims, and the Academy was entitled to receive any reserve funds that remained after the policies terminated and all claims had been paid. *Id.* at 1157. The insurer was allowed to invest the reserves, but in acknowledgment of the Academy's eventual claim to the excess reserves the insurer was required to make annual interest payments to the Academy based on the amount of reserves it held. *Id.* Noting that the Academy "had no administrative or underwriting responsibilities" with respect to the policies, and the amounts paid to the Academy "were neither brokerage fees nor other compensation for commercial services," *id.* at 1159, the Eighth Circuit held that the interest payments were not taxable as income unrelated to the Academy's tax-exempt purpose.

Again, ABRA's situation is quite different. The interest payments at issue in *Academy* were not compensation for services rendered, *id.* at 1158, a fact to which the parties stipulated and on which the Court relied. By contrast, ABRA was paid "a program expense fee for its services in connection with the Program." Joint Stipulation of Facts (Dkt. 35) ¶ 24. ABRA did provide administrative services, and the Plans did compensate ABRA for those services. *American Academy* is not on point.

---

firms, whether it employs those who provide the services directly or hires a vendor to do so. And other organizations have provided individual services with a similarly small number of employees. *See Carolinas Farm*, 699 F.2d at 168 (association with four employees provided insurance services to individual members).

ABRA also seeks to equate its retirement program—which was unique (if at all) only insofar as it is claimed to be the only retirement program designed for the legal market and sponsored by the ABA—to the deposit insurance provided in *Credit Union*. 86 F.3d at 1336. That comparison does not bear scrutiny. The insurance provided in *Credit Union* was not of the type generally provided by for-profit companies—indeed, for-profit companies were barred by state law from providing deposit insurance. *Id.* But here, for-profit retirement planners certainly could have designed programs for the legal market similar to the ABRA's Program, and competitors did offer programs (even though not specifically designed for the legal market) in which many attorneys and law firms participated. ABRA competed with those retirement plan providers and, so, its arguments are unavailing. ABRA was engaged in business activities of a kind generally carried on for profit, and fails to qualify for tax-exempt status for that reason as well.

**C.    ABRA is Not of the Same General Class as a Chamber of Commerce or Board of Trade.**

ABRA has offered virtually no explanation of how it is of the same general class as a chamber of commerce or board of trade. ABRA does argue that the narrowness of its mission should not preclude it from meeting this requirement, noting that several bar associations limiting their membership by practice area, ethnicity, gender, sexuality, or geography have been approved as tax exempt 501(c)(6) organizations by the IRS. ABRA Reply (Dkt. 59) at 4-5 & n. 4. But all of those bar associations presumably seek to generally "foster [the] well-being" or "promote some aspect of the general economic welfare" of the groups for which they are organized. *See National Muffler Dealers Ass'n, Inc. v. United States*, 565 F.2d 845, 846 (2d Cir. 1977) *aff'd*, 440 U.S. 472 (1979) (explaining requirement that organizations be of the same general class as a chamber of commerce or board of trade). Here, and as already discussed,

ABRA exists to provide particular services promoting the business interests of only those attorneys or law firms that participate in the Program. It did not provide general support to the legal industry or any subclass thereof. Therefore, it was not, during the years in question, of the same general class as a chamber of commerce or board of trade and fails to qualify for tax-exempt status on that basis as well.

## II.     The IRS Has Not Acknowledged ABRA As A Business League.

In addition to arguing that it is a business league, ABRA argues that the IRS previously recognized it as a business league by approving retirement plans that it proposed, and that the Government should not now be permitted to deny ABRA tax-exempt status.

The IRS allows trade or professional associations to sponsor plans which, if approved by the IRS, can be adopted by groups of self-employed individuals who are members of the associations. During the relevant time, the IRS defined "sponsoring organizations" of such plans to include "a trade or professional organization having characteristics similar to those described in section 1.501(c)(6)-1 of the regulations which markets its plan only to its members in their capacity as adopting employers." Rev. Proc. 89-9,[15] 1989-1 C.B. 780, 781, superseded by Rev. Proc. 2000-20, 2000-1 C.B. 553. ABRA correctly argues that the IRS must have considered ABRA to be an appropriate "sponsoring organization" because it approved retirement plans that ABRA submitted.

But being a "sponsoring organization" does not make ABRA a business league; at most, it means that ABRA has "characteristics *similar to those*" described in the business league regulations. *Id.* (emphasis added). It is not inconsistent for the IRS to determine that ABRA is

---

[15] The purpose of Rev. Proc. 89-9 was to set forth IRS procedures for issuing opinion letters relating to master or prototype retirement plans. *Id.*

not actually a business league even though it previously (and implicitly) found that it was similar to a business league, and the IRS is not estopped from making that determination. "Similar to" does not mean "the same as" and indeed suggests that there remains some difference between the similar, but non-identical, items. *See, e.g., First Fed. Sav. & Loan Ass'n of Boston v. State Tax Comm'n*, 437 U.S. 255, 264 (1978) ("The statutory term 'similar' usually . . . does not mean 'identical.'"); *United States v. Jackson*, 479 F.3d 485, 489 (7th Cir. 2007) ("'substantially similar' does not mean 'identical'"). Further, the only authorized way to obtain tax-exempt business league status is to file Form 1024, Application for Recognition of Exemption Under Section 501(a), which ABRA did on June 28, 2004. Earlier IRS letters approving ABRA's retirement Plans related to the acceptability of those Plans only; they were not rulings that ABRA itself was a tax-exempt business league.

Relatedly, to the extent that ABRA's argument has an estoppel flavor, its own conduct is more pungent. ABRA's actions confirm that it knew that the IRS approval went only to its plans, not to the tax-exempt nature of ABRA itself. The IRS issued letters approving ABRA's first plans no later than February 26, 1992 (*see* Dkt. 51-2), but ABRA continued paying taxes and did not apply for recognition as a tax-exempt business league until over twelve years later. Indeed, for the first 40 years or so of its existence, ABRA did not claim tax-exempt status, filed tax returns, and paid income taxes on its earnings. It points to no change in the statute, applicable regulations, or its own structure or activities, that would explain its change of position on this issue. While the fact that it took ABRA almost forty years to fashion an argument for tax exemption does not, as a legal matter, preclude it from seeking the exemption now, it does suggest that the merit of its argument is less than obvious.

## III.    ABRA Waived its "Integral Part" Argument.

ABRA also argues that it should be exempt because it is an "integral part" of the ABA, another tax-exempt organization. ABRA relies on Treas. Reg. § 1.502-1(b) (26 C.F.R. § 1.502-1), which states in relevant part:

> If a subsidiary organization of a tax-exempt organization would itself be exempt on the ground that its activities are an integral part of the exempt activities of the parent organization, its exemption will not be lost because, as a matter of accounting between the two organizations, the subsidiary derives a profit from its dealings with the parent organization . . . .

ABRA argues that even if it does not qualify for tax exemption standing alone, it is derivatively exempt because its activities are an integral part of the ABA's activities.

There are at least three problems with this derivative exemption argument. First, ABRA waived it. "A timely, sufficient claim for refund is a jurisdictional prerequisite to a refund suit." *Martin v. United States*, 833 F.2d 655, 658-59 (7th Cir. 1987). The claim for refund must specifically set forth the grounds for the refund, and courts are without jurisdiction to consider grounds not included in the initial claim. *Estate of Bird v. United States*, 534 F.2d 1214, 1219 (6th Cir. 1976); *see also Stelco Holding Co. v. United States*, 44 Fed. Cl. 703, 712 (1999) ("it is beyond this court's jurisdiction to adjudicate any . . . claim for refund pleaded on grounds not expressly or impliedly stated in [the] administrative refund claim"). ABRA's application does not mention Treas. Reg. 1.502-1(b), nor argue that ABRA is an "integral part" of the ABA. Dkt. 1-3.

Second, ABRA's point is that if the ABA offered the Program itself, rather than through ABRA, the ABA would not lose its tax exemption. But that result would say nothing about whether revenues generated by the Program should be exempt from taxation. As noted above (n. 9), if an exempt organization like the ABA had offered the Program, the revenues it earned

would have to qualify as UBI. And given that part of the UBI test requires an assessment of whether the income at issue was derived from an activity "directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons," as also required by § 1.501(c)(6)-1, there is no basis to conclude that income from the Program would be tax-exempt even had the ABA offered the Program directly.

Which leads to a final point—namely, that ABRA has not shown that it is an integral part of the ABA. ABRA says that the ABA's purpose is to serve members of the legal profession "by defending liberty and justice." ABRA MSJ (Dkt. 52) at 4. For all of the reasons already discussed, however, ABRA has failed to establish that its Program promotes a common interest of the legal profession; its association with the ABA does not change that fact. It is more than a stretch to conclude that providing tax-advantaged retirement plans to the legal profession is integral to defending liberty and justice, particularly when many other similar options were available and where the ABA managed to pursue the defense of liberty and justice with noteworthy success for many years before ABRA was even a twinkle in its collective eye. ABRA's argument that its activities are integral to the ABA's mission is not persuasive.

*     *     *

For the reasons set forth above, the Government's motion for summary judgment is granted and ABRA's cross-motion for summary judgment is denied.

Entered: April 25, 2013

John J. Tharp, Jr.
United States District Judge